# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

VIVIANE MAJDALANI,                    )
                                      )
                    Plaintiff,        )        **CIVIL ACTION**
                                      )
v.                                    )        No. 06-1317-MLB
                                      )
LEGACY BANK,                          )
                                      )
                    Defendant.        )
_____      )

## MEMORANDUM AND ORDER

This matter comes before the court on defendant Legacy Bank's motion for summary judgment. (Doc. 121.)  The motion has been fully briefed and is ripe for decision. (Docs. 134, 138.)  Legacy Bank's motion is GRANTED for the reasons stated more fully herein.[1]

---

[1]   Plaintiff's contentions in the parties' pretrial order identify a lengthy list of allegations of discrimination and retaliation (Doc. 109 at 5-13), and the facts relating to these contentions are detailed herein.

Legacy Bank moved for summary judgment on plaintiff's claims regarding her co-worker's (Nancy Mundwiler's) behavior; that Legacy Bank harassed her through e-mail; that she was not granted a requested vacation day; that her December 2003 raise and bonus were discriminatory; that her hours and duties were changed after she filed a January 2004 administrative charge; and that her e-mail was monitored after she filed her January 2004 administrative charge. Doc. 123 at 19-26.)

Plaintiff does not respond to Legacy Bank's motion on these claims, and therefore has apparently abandoned these theories. Regardless, the court must assure itself that there is no genuine issue of material fact and that Legacy Bank is entitled to judgment as a matter of law on the claims discussed. See Reed v. Bennett, 312 F.3d 1190, 1194-95 (10th Cir. 2002) (discussing summary judgment procedure when no response is filed); Wagner-Harding v. Farmland Industries Inc. Employee Retirement Plan, 26 Fed. Appx. 811, 815 (10th Cir. 2001) ("[E]ven if an adverse party does not respond to a motion for summary judgment, the district court must still determine, as the rule requires, that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."). For substantially the reasons stated by Legacy Bank in its motion, the court finds Legacy Bank entitled to judgment as a matter

This is an employment discrimination case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981 ("section 1981"). Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 gives all persons equal rights under the law as are given White citizens. 42 U.S.C. § 1981(a).

## I.   FACTS AND PROCEDURAL HISTORY[2]

Plaintiff, Viviane Majdalani, was born in Lebanon and became an American citizen on May 16, 1988. Plaintiff's race is Caucasian and her national origin is Lebanese. Plaintiff began work as an employee of Legacy Bank on or about May 1, 1995. The parties stipulate that during plaintiff's employment with Legacy Bank, plaintiff was an "employee," and that Legacy Bank is an "employer" within the meaning of Title VII.[3] When plaintiff began work with Legacy Bank in 1995, she was a branch secretary, a position later known as a customer

---

of law and GRANTS Legacy Bank's motion on these claims.

[2]   All facts set forth are either uncontroverted, or, if controverted, taken in the light most favorable, along with all favorable inferences, to plaintiff. See Hall v. United Parcel Serv., No. Civ. A. 992467-CM, 2000 WL 1114841, at *5 (D. Kan. July 31, 2000) (citing Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998)). To the extent relevant, the factual disagreements between the parties will be noted.

[3]   The parties stipulated to many facts in support of their summary judgment briefing. The court appreciates counsels' willingness to engage in this time-saving practice.

service representative ("CSR").   Legacy Bank later created two categories of CSRs, I and II (also called CSR I and CSR II).   In November 2000, plaintiff became a CSR II/loan assistant.  This was an hourly position.

Frank Suellentrop is the president and CEO of Legacy Bank and has held the position since 1992.  Brad Yaeger is currently the executive vice-president of Legacy Bank, and his previous position was senior vice-president.   Yaeger oversees all of the bank's lenders and is involved with strategic planning and oversight of other department managers.   Jean Botkin was initially hired at Legacy Bank as an operations officer; she is currently vice-president of retail and has been in that position since 2003.   As operations officer, Botkin supervised the tellers.   Donna Tinkler is currently the human resources officer at Legacy Bank and has been at the position since 1994.   Kim Bugner began work at Legacy Bank as a teller in 1992. Bugner was promoted to consumer loan officer in 1999.   Bugner is currently consumer loan manager and has been in that position since 2000.  As consumer loan manager, Bugner supervises loan officers.  Dan Madsen was plaintiff's branch manager in 2003.

## A.   The Mundwiler Grievance

On March 12, 2003, plaintiff filed an internal grievance concerning another employee, Nancy Mundwiler.   Mundwiler made a comment regarding a phone call, to the effect that the caller had an accent like plaintiff's, and maybe was her mother.  Plaintiff was offended because Mundwiler yelled across the lobby that the caller was "somebody with your accent."   Mundwiler was not plaintiff's supervisor, but rather was a co-worker at the branch where plaintiff

worked.   Legacy Bank investigated the incident by interviewing the employees at that bank location, and Mundwiler was disciplined. Mundwiler was counseled about the inappropriateness of her comment, required to take a class on diversity, and was given a written warning for her personnel file.

Plaintiff submitted a second internal grievance complaint concerning Mundwiler around April 17, 2003.  Plaintiff made the second complaint because Mundwiler "continued to harass" her by giving her dirty looks, watching her, and listening to her conversations.  After plaintiff filed her second internal complaint, the bank again investigated.  Mundwiler was put on probation and ultimately resigned from her position on April 24, 2003.

## B.  The Teller Supervision and Absence Log Incidents

In October 2003, an incident occurred concerning plaintiff's interaction with the tellers at Legacy Bank.  Plaintiff sent an e-mail to Madsen and Botkin purporting to summarize a conversation between herself and Madsen the previous day, generally stating the Madsen told plaintiff she was not responsible for the supervision of the tellers or the management of the bank branch.  Madsen e-mailed Botkin about plaintiff, generally stating that he felt bank management had contributed to plaintiff's misunderstanding of her role and that, therefore, the situation should not be dealt with as a performance review item.  Later that same day, Madsen responded to plaintiff with his summation of their previous day's conversation, generally stating that she was not responsible for supervision of the tellers but that she should speak up if she saw an error or fraud occurring, or if a teller came to her with a question she could answer.  Madsen stated

that during the previous day's conversation, plaintiff had "talked over" Madsen.

Plaintiff was in charge of keeping a log of absences for Legacy Bank employees in 2003. Around this same time, through correspondence with Botkin, Madsen determined that Majdalani's tracking of time was duplicative, and decided to discontinue the procedure.

## C.   The Vacation Day "Bump Up" Incident

In early November 2003, plaintiff was advised she would not be allowed to have December 26 as a vacation day, and that another employee, Katrina Roybal, had been given the vacation day. Previously, in January 2003, plaintiff had requested vacation for December 26, but the decision on her request was "deferred."  Later that same month, employees were advised of the policy of Legacy Bank that each employee should only have two vacation days per year that bump up to a holiday. Plaintiff had already been granted two bump up days in 2003. When Roybal requested vacation in October 2003 for December 26, and Roybal had not yet had her two bump up days, Roybal was given the vacation day. Plaintiff renewed her request for the December 26 vacation day approximately ten days after Roybal made her request. Tinkler contends she gave Roybal the requested date because Roybal asked first and because Roybal had not yet had her two bump up days. Roybal's race and nationality are unknown. Plaintiff has identified eleven other employees who were permitted more than two bump up days. However, the positions of these employees are unknown, as well as the year in which the "bump-ups" occurred.

## D.   The 2003 Raise and Bonus Controversy

Plaintiff contends she suffered discrimination in connection with

raises and bonuses given by the bank in December 2003.   In 2003, Legacy Bank used a  program called Compease to assist with year-end pay raises.  Compease gives ranges for comparable positions within the banking industry.  Legacy Bank compared salaries with industry figures and then set raises by comparing its positions to Compease, and then adjusting based on years on the job and job performance, or supervisor recommendation.  Of the eight employees who plaintiff claims held her same position, three employees did not work at Legacy Bank in December 2003 to enable a raise comparison.  Of the remaining five employees, the majority of the raises were less or the same amount as plaintiff's raise, and even with the raises that the other employees received, four of the five of those employees still made less than plaintiff.

In 2003, hourly-paid employees' bonuses were set by department managers, and Suellentrop believed almost all bonuses in 2003 were determined by the amount of time the employee worked at the bank.  In 2002, only three employees, including plaintiff, each received a seven hundred fifty dollar bonus.  In 2003, those same three employees received a five hundred dollar bonus.  No hourly employee received seven hundred fifty dollar bonus in 2003.

**E.  The 2004 Overtime Controversy**

Plaintiff next contends she was discriminated against with respect to overtime in 2004.  In January 2002, Tinkler disseminated to employees Legacy Bank's guidelines for weekly hours for hourly employees.  Tinkler generally stated that bank management wanted to control the amount of overtime worked by employees in order to control costs.  Later, in July 2002, bank management discussed with plaintiff her unique work situation that caused her to accrue overtime, and

-6-

determined that plaintiff should be able to take an afternoon off in order to decrease her overtime hours worked.   In early 2004, Suellentrop and others discussed employee overtime at a strategic planning meeting.   Suellentrop testified that, as a matter of bank wide policy, the amount of overtime was going to be controlled to reduce expenses.   Plaintiff's schedule was changed as a result of the new bank policy.   As a result, on February 11, 2004, plaintiff's ability to earn overtime was reduced.   Plaintiff testified at her deposition that she was the only hourly employee who opened and closed and therefore implied that the change in policy affected only her.

**F.   Complaints of Mistreatment During Early 2004**

On January 29, 2004, Madsen sent an interoffice memorandum to all employees at plaintiff's branch concerning new procedures.   The new procedures required officer approval for opening new accounts with credit scores less than six hundred, required an officer's signature when a bank employee waived certain fees, required a thumbprint signature when cashing checks for non-customers, and required supervisory approval before waiving fees.   Plaintiff asserts that she was the only employee at her branch affected by the new policy regarding officer approval for new accounts with credit scores less than six hundred.

On April 12 and April 13, 2004, plaintiff was absent from work. Plaintiff's post-deposition affidavit contends that she never missed work without calling in, but Suellentrop stated that plaintiff did not call into human resources stating the reason for her absence. Suellentrop further testified that because the bank had not heard from plaintiff, this created a customer service issue, and it began

monitoring plaintiff's e-mail and plaintiff's computerized calendar. On April 16, 2004, plaintiff applied for sick leave for the two missed days.

Plaintiff believed her e-mail was regularly being monitored in April 2004 because three of her e-mails were forwarded to Tinkler on April 29, 2004, despite being addressed only to plaintiff. However, plaintiff had signed an acknowledgment and consent form regarding Legacy Bank's intranet/electronic policy and in that policy, Legacy Bank reserved the right to monitor plaintiff's e-mail. Plaintiff inquired of the bank's computer technician why the e-mails were bouncing back to the sender as undeliverable to Tinkler, despite not having been addressed to Tinkler. The computer technician responded to plaintiff that this was happening because plaintiff's account was being used to test the server.

**G.   Plaintiff's Unsuccessful Application for Mortgage Department Manager**

On April 20, 2004, plaintiff expressed interest in applying for an opening with Legacy Bank as a mortgage department manager, a salaried officer position. Officer positions require election by Legacy Bank's board of directors. Plaintiff was paid hourly when she was not an officer of Legacy Bank and was eligible for overtime pay. Plaintiff believed that there was a distinct difference and advancement in having an officer position rather than having an hourly employee position. The mortgage department manager position required previous mortgage loan experience, training other customer service representatives, and supervision of other employees. Plaintiff had no supervisory experience, had never made the final decision on a

-8-

mortgage, and had no experience working for a title company.[4]

Suellentrop testified that plaintiff was not qualified for the position of mortgage department manager because she had no supervisory experience and that plaintiff's work experience was not the level that would have been necessary to qualify her for the position because she had no experience in loan origination or as a loan officer.[5]

Yaeger was also part of the decision process of who to hire for mortgage department manager.  Yaeger testified that Kathy Seiler was hired for the position because her qualifications included fifteen to twenty years of experience with a title company and with closing loans and that Seiler understood title work completely.  An announcement was sent regarding Seiler's hiring on September 7, 2004.[6]  Seiler had prepared closing documents for commercial and residential mortgage

---

[4]  Plaintiff has attempted to controvert her lack of supervisory experience by citing an e-mail sent from Madsen to Botkin in October 2003.  In that e-mail, sent six months before April 2004, Madsen wrote that he had witnessed many occasions where bank management treated plaintiff like a second in command or an assistant bank manager. Again, however, this e-mail was sent from Madsen in a completely different context than when plaintiff expressed interest in the mortgage department manager position.  It does not controvert that plaintiff's CSR position with Legacy Bank did not formally include supervision of employees.

[5]  Plaintiff attempts to attack Suellentrop's testimony by alleging that the person that was chosen for the position also did not have work experience originating loans.  The cited record does not, however, support this attack.  The record shows that the person hired had previous experience working for a title company and that plaintiff testified that title companies close loans.  Plaintiff did not testify that the person hired did not have loan origination experience.  The cited record does not speak to the hired person's loan origination experience, or lack thereof.

[6]  At one point in her argument regarding her retaliatory discharge claim, plaintiff contends Seiler was hired on May 20, 2004. Plaintiff does not, however, provide a record citation for this alleged fact.

loans and had a significant amount of contacts with realtors.  Prior to her employment at Legacy Bank, she was the general manager and senior vice president of a title company.  Plaintiff was not interviewed for the position.

## H.  Plaintiff's Unsuccessful Application for Branch Manager

Plaintiff applied for the branch manager/consumer loan officer position in May 2004.  The branch manager/consumer loan officer position would have been an officer position which required election by the board, and would have involved plaintiff moving from an hourly position to a salaried position, making her exempt from overtime pay. The position required supervision of other employees.  Botkin, who supervised the tellers at the branch where plaintiff was employed, testified that plaintiff and the tellers disagreed on some things and that the tellers believed plaintiff was overstepping her bounds. Plaintiff had never worked as a teller and would have supervised the tellers who had complained about plaintiff's behavior.

Botkin, Bugner, Yaeger, and Suellentrop were involved in the decision to hire Cheryl Hill instead of plaintiff for the branch manager/consumer loan officer position.  Hill's qualifications included being a loan officer at a bank, and she also had lending, management, teller, and new account experience.  Hill had managed numerous locations, had a management and a loan background, and had been an assistant branch manager and branch manager at a credit union. Hill was announced as the selection for the position on June 9, 2004.[7]

---

[7]  In her argument on her retaliatory discharge claim, plaintiff states a hire date for Hill as May 25, 2004.  Again, however, this date is not supported by a citation to the record.

## I.  Plaintiff's Successful Application for Mortgage/Consumer Loan Officer

In the summer of 2004, plaintiff was an internal applicant and was interviewed for a mortgage/consumer loan officer position. Suellentrop, Yaeger, and Bugner interviewed plaintiff. Yaeger worked at the same branch as plaintiff so he personally observed her working capacity.  Plaintiff was offered and accepted the position of mortgage/consumer loan officer in August of 2004 to be filled by her when a replacement for her CSR position was hired and trained.  The board of directors at Legacy Bank had to elect plaintiff to the loan officer position, and the board voted on September 22, 2004 to elect plaintiff.  Plaintiff's mortgage/consumer loan officer position took effect on October 1, 2004.  Prior to her assuming the position in October 2004, all positions in which plaintiff had been employed at Legacy Bank were hourly paid, non-exempt, non-officer positions.

After plaintiff was promoted to the position of mortgage/consumer loan officer, her replacement was hired on August 30, 2004, but his start date was not until September 7, 2004, and then he needed to be trained on all procedures, which took several weeks.  Plaintiff began performing the duties of mortgage/consumer loan officer on October 1, 2004.

When plaintiff was interviewed for the mortgage/consumer loan officer position on July 28, 2004, she was given a job description that indicated she would report to the senior vice president (Yaeger) and the consumer loan manager (Bugner).  When plaintiff was offered the position on August 9, 2004, she was given the "final draft" of the job description which again indicated that she would report to both

-11-

the Yaeger and Bugner.  The hire letter sent to plaintiff on September 21, 2004, however, eliminated Yaeger and listed only Bugner as the person to whom plaintiff would report.  In addition, Sam Lines and Kathy Seiler were also responsible for supervising her and providing assistance related to mortgage loan questions and problems.  According to plaintiff, the reason was that Bugner herself did not have mortgage experience, only consumer loan experience.  Plaintiff did report to Bugner on some issues.

Plaintiff sent an e-mail to bank management on September 27, 2004 expressing her disappointment that the title and duties of the position had changed after she had accepted the position.  The job description initially stated 50% mortgage lending and 25% consumer lending, but had been changed to 75% mortgage and consumer lending.  Plaintiff knew that her day-to-day lending work would depend upon the customers and applicants Legacy Bank had.  Plaintiff had already been processing consumer loans and wanted to advance by processing mortgage loans.  In Legacy Bank's notes which were taken when the job was offered to plaintiff, the notes state that Suellentrop told plaintiff: "you need to be flexible with mortgage side and consumer side or wherever we need the help."

Yaeger and Bugner had a discussion with plaintiff in late September 2004 regarding the title and job description.  Bugner testified that during the discussion with plaintiff, plaintiff was upset, rude, interrupted Bugner and Yaeger and would not let them talk, and argued with everything Bugner and Yaeger said.  Plaintiff counters in her post-deposition affidavit, however, that she was not rude and did not interrupt Bugner and Yaeger.

-12-

Yaeger also testified about the meeting with plaintiff. Yaeger stated that plaintiff was insubordinate, that when he attempted to speak with her diplomatically, plaintiff talked over him and Bugner, that plaintiff raised her voice, did not listen to explanations, and interrupted them. On September 28, 2004, Bugner prepared a memorandum regarding the discussion between Bugner, Yaeger, and plaintiff. Legacy Bank added the "mortgage" officer designation back to plaintiff's title.

At some point during her initial ninety days in the new position, Yaeger also discussed with plaintiff the fact that she was keeping her door closed and not interacting with staff. After he spoke with plaintiff, Yaeger did not have any problems with plaintiff and the same behavior again. Yaeger also testified regarding plaintiff's co-workers who had problems with plaintiff helping them with customer issues.

Another time during this period, plaintiff called Bugner because plaintiff was upset when a commercial loan officer sent a customer to plaintiff and indicated that plaintiff could help the customer with a loan. Plaintiff believed it was not her responsibility to help the customer with the loan and that the co-worker was dumping the loan on her. Bugner told plaintiff the loan was part of her job duties and that plaintiff was argumentative in response. Plaintiff responds by way of a post-deposition affidavit that she was not upset or argumentative and that Bugner had told her not to do commercial loans during her training.

Again during this period, Bugner and plaintiff had a discussion about plaintiff asking questions of others instead of Bugner. Bugner

-13-

knew plaintiff was taking questions to other employees, rather than to Bugner, because other employees told Bugner this was happening. Bugner instructed plaintiff to come to her for questions regarding loans.  Plaintiff's version is that she was told to take her loan questions to Bugner, but that she should consult with Sam Lines and Kathy Seiler because they were more knowledgeable about mortgages. Plaintiff often had to ask others questions instead of Bugner because Bugner worked at a different branch than plaintiff and wasn't always available to plaintiff.

Yaeger believed plaintiff did not have a good understanding of how to make a real estate loan, and that plaintiff could not accurately present or prepare loan documents with regard to a residential investment property.  Yaeger did not believe plaintiff was doing a good job for multiple reasons, including that plaintiff was insubordinate, that plaintiff did not interact with others and stayed in her office, that commercial loan officers were afraid to refer a consumer loan to plaintiff because of concerns the customers had with the time it would take plaintiff to make a decision, that plaintiff asked a lot of questions and did not have a good understanding of what to do with a real estate loan, that plaintiff did not report to work on time, and that plaintiff had difficulty evaluating credit requests. Bugner believed plaintiff was not willing to exercise any judgment in making loans.

## J.  The "Write Up" Controversy

All new employees and existing employees who are promoted to a new job within Legacy Bank are placed in an introductory status for a three-month period, for training and evaluating the employee's

-14-

adjustment.    An  extension  of  the  introductory  period  may  be
implemented  by  a  supervisor  if  deemed  warranted  in  order  to  achieve
satisfactory  job  performance.   Plaintiff's  loan  officer  position  was
subject  to  the  ninety  day  introductory  period.   In  addition,  Legacy
Bank's  disciplinary  policy  states  that  "progressive  discipline  may  be
applied  as  appropriate"  and  that  "the  Bank  can  discipline,  up  to  and
including  discharge,  for  any  violation  of  any  Bank  rule  or  policy  or
other  inappropriate  conduct  or  action."   After  plaintiff's  promotion,
Bugner  was  responsible  for  plaintiff's  evaluation.

During  a  training  session  on  September  21,  2004,  plaintiff
noticed  on  Bugner's  computer  screen  that  she  was  scheduled  for  a
"write-up"  in  30  days.   Plaintiff  does  not  recall  asking  Bugner  what
the  term  "write-up"  meant.   Bugner  testified  that  the  term  write  up
was  used  in  her  task  list  to  remind  herself  to  "write  up  a  memo  to  the
file  at  30  and  60  days  so  I  can  determine  -  it  helps  me  better  prepare
for  when  we  do  their  90-day  review"  and  that  the  term  had  no  negative
connotation  and  that  it  is  something  she  does  for  all  employees.
Plaintiff's  post-deposition  affidavit  states  that  she  heard  the  term
write  up  used  by  supervisors,  but  always  in  regard  to  a  disciplinary
measure,  and  never  in  reference  to  a  performance  review.

**K.  Plaintiff's Termination**

Yaeger  and  Bugner  discussed  the  performance  and  work  issues  that
had  occurred  with  plaintiff  throughout  her  ninety  day  probation
period.   Yaeger  and  Bugner  spoke  with  Suellentrop  about  the  issues
with  plaintiff's  performance  near  the  end  of  plaintiff's  ninety  day
probation  period.  Yaeger,  Bugner,  and  Suellentrop  discussed  offering
plaintiff  more  training,  but  they  concluded  they  did  not  believe

plaintiff would be open to coaching.   Suellentrop made the final decision to terminate plaintiff, based on the recommendations of Yaeger and Bugner.   Plaintiff's employment was terminated on January 18, 2005.

Plaintiff testified that Bugner never informed her she was not meeting expectations during her ninety-day probation period and that she did not know she was not meeting expectations until "they" terminated her.   Plaintiff was not offered a transfer to another position at the time of her discharge.   Legacy Bank's policies would have allowed for this possibility, but Bugner is not aware of anyone else at Legacy Bank who was promoted and then went back to their former position when the new position did not work out.   Bugner explained that other loan officers have been terminated at the end of their ninety day probation period, such as Candace Harrelson. Harrelson was hired on April 11, 2005 as branch manager/consumer loan officer and terminated on July 25, 2005 because she was not meeting Legacy Bank's expectations and Legacy Bank did not believe that Harrelson's performance would improve.   On June 28, 2005, Bugner and Botkin met with Harrelson and discussed performance concerns with Harrelson, and met with her again on July 12, 2005 regarding the same. Bugner testified that Harrelson's specific performance problems included a lack of confidence in making loan decision and the inability to understand a loan request.

## L.   The January 2004 KHRC and EEOC Charge

Plaintiff filed a charge of discrimination with the Kansas Human Rights Commission ("KHRC") and the Equal Employment Opportunity Commission ("EEOC") on January 21, 2004.   She did not check the box

indicating that she was discriminated or retaliated against on the basis of race.  Plaintiff checked the box for national origin, ancestry, and retaliation discrimination.  Plaintiff alleged that because of her Lebanese national origin, she was: passed over for promotions; denied vacation days; retaliated against for making complaints of harassment and discrimination; and harassed by her co-worker (Mundwiler) without responsive proper action by Legacy Bank.

**M.   The June 2005 KHRC and EEOC Charge**

Plaintiff filed a second charge of discrimination with the KHRC and the EEOC on June 6, 2005.  She did not check the box indicating that she was discriminated or retaliated against on the basis of race. She checked the box for national origin, ancestry, and retaliation discrimination.  In her June 2005 administrative agency complaint, plaintiff alleged that she was promoted on August 11, 2004 but that when her new position went into effect on October 11, 2004, the job description was different than the one utilized for that same position prior to her promotion.  Plaintiff also reported Bugner's scheduled thirty day "write up."  Finally, plaintiff reported her termination and that she was not given the opportunity to resume her former position with Legacy Bank.  (Doc. 1 at 25-26.)

**N.   The Lawsuit**

Plaintiff filed suit on October 24, 2006.  Plaintiff asserts claims against Legacy Bank for: 1) national origin discrimination under Title VII for failure to promote; 2) national origin discrimination under Title VII for termination of her employment; 3) retaliation under Title VII; and 4) intentional discrimination and retaliation "due to race or color-based motivations" under section

-17-

1981.  (Doc. 109 at 17.)   The court has previously limited the temporal scope of plaintiff's claims:

> Defendant's motion to dismiss plaintiff's allegations under Title VII which occurred prior to March 28, 2003 is granted.  Defendant's motion to dismiss plaintiff's allegations under § 1981 which occurred prior to October 24, 2002 is granted.   Defendant's motion to dismiss plaintiff's allegations under § 1981 which occurred between October 24, 2002 and October 24, 2004 is denied.

(Doc. 49 at 14.)

## II.   SUMMARY JUDGMENT STANDARDS

The usual and primary purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim."  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citations omitted); see also Adams v. Am. Guarantee & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000) (citing Adler).  The mere existence of some factual dispute will not defeat an otherwise properly supported motion for summary judgment because the factual dispute must be material.  See Renfro v. City of Emporia, 948 F.2d 1529, 1533 (10th Cir. 1991).

A defendant initially must show both an absence of a genuine

-18-

issue of material fact and entitlement to judgment as a matter of law. See Adler, 144 F.3d at 670.  Because a plaintiff bears the burden of proof at trial, a defendant need not "support [its] motion with affidavits or other similar materials negating [a plaintiff's]" claims or defenses.  Celotex, 477 U.S. at 323 (emphasis in original). Rather, a defendant can satisfy its obligation simply by pointing out the absence of evidence on an essential element of a plaintiff's claim.  See Adler, 144 F.3d at 671 (citing Celotex, 477 U.S. at 325).

If the defendant properly supports its motion, the burden then shifts to the plaintiff, who may not rest upon the mere allegation or denials of its pleading, but must set forth specific facts showing that there is a genuine issue for trial.  See Mitchell v. City of Moore, Okla., 218 F.3d 1190, 1197-98 (10th Cir. 2000).  In setting forward these specific facts, the plaintiff must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  Adler, 144 F.3d at 671.  If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. See Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 533 (10th Cir. 1994).  A plaintiff "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 793 (10th Cir. 1988).  Put simply, the plaintiff must "do more than simply show there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In the end, when confronted with a fully briefed motion for

-19-

summary judgment, the court must determine "whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).   If sufficient evidence exists on which a trier of fact could reasonably find for the plaintiff, summary judgment is inappropriate. See Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677, 684 (10th Cir. 1991).

## III.   ANALYSIS

Plaintiff alleges three distinct harms: failure to promote, discriminatory termination, and retaliatory termination.  (Doc. 109.) Legacy Bank moves for summary judgment on all claims.  (Doc. 121.)

## A.   Exhaustion of Title VII Failure to Promote Claims

Shortly after plaintiff's case was filed, the court ruled on a motion to dismiss brought by Legacy Bank.  The motion alleged that certain of plaintiff's claims under Title VII (those occurring prior to March 28, 2003) should be dismissed because they were not timely administratively exhausted.  The court dismissed plaintiff's Title VII failure to promote claims occurring prior to March 28, 2003, holding that they were time barred because plaintiff's first administrative charge was not timely with respect to these claims.  The court did not rule on the viability of plaintiff's claims arising after that date, as it had not been moved to do so.  (Doc. 49 at 9-10.)  Regarding plaintiff's remaining failure to promote claims (i.e., anything occurring after plaintiff's first administrative charge in January 2004), Legacy Bank now moves for summary judgment based on lack of exhaustion.  (Doc. 123 at 13-15.)

-20-

Title VII requires a plaintiff to exhaust her administrative remedies prior to suit. <u>Shikles v. Sprint/United Mgmt. Co.</u>, 426 F.3d 1304, 1317 (10th Cir. 2005). A Title VII plaintiff must exhaust administrative remedies for each individual discriminatory or retaliatory act. <u>Martinez v. Potter</u>, 347 F.3d 1208, 1211 (10th Cir. 2003). "Unexhausted claims involving discrete employment actions" are not viable. <u>Id.</u> at 1210. As part of the exhaustion requirement, Title VII requires a plaintiff to file a charge within 300 days of the allegedly discriminatory employment practice, in cases where the plaintiff has initially instituted proceedings with the state agency.[8] 42 U.S.C. § 2000e-5(e)(1) (stating that a charge "shall be filed . . . within three hundred days after the alleged unlawful employment practice occurred"). "A discrete retaliatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within . . . 300 days of the date of the act or lose the ability to recover for it." <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 110 (2002).

Plaintiff alleges two incidents of failure to promote which occurred after her initial administrative complaint in January 2004 but prior to her amended administrative complaint in June 2005. Three hundred days prior to plaintiff's June 6, 2005 administrative agency complaint is August 11, 2004. Plaintiff's claims under Title VII for failure to promote relate to: 1) the April 2004 mortgage department

---

[8] Kansas is a deferral state where the 300 day time limit applies. <u>See</u> 29 C.F.R. § 1601.80 (designating the Kansas Commission on Civil Rights as a deferral agency); <u>Brown v. Unified Sch. Dist. 501</u>, 465 F.3d 1184, 1186 (10th Cir. 2006) (recognizing Kansas as a deferral state).

manager opening which was filled by Kathy Seiler in September 2004; and 2) the May 2004 branch manager opening which was filled by Cheryl Hill in June 2004.

Plaintiff failed to timely exhaust her administrative remedies regarding the May 2004 job opening filled in June 2004. See Morgan, 536 U.S. at 110 (requiring a Title VII plaintiff to file an administrative charge within 300 days of a discriminatory act or "lose the ability to recover for it"). Plaintiff did, however, timely file an administrative charge regarding the April 2004 job opening that was filled in September 2004. See id. (holding that discriminatory acts "occur" on the day that they "happen"). The June 2005 administrative charge discusses plaintiff's "promotion" at Legacy Bank. See MacKenzie v. City & County of Denver, 414 F.3d 1266, 1274 (10th Cir. 2005) (stating that a plaintiff's Title VII claim is "limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC"); Foster v. Ruhrpumpen, 365 F.3d 1191, 1195 (10th Cir. 2004) (administrative charges are liberally construed). As a result, plaintiff has timely exhausted her administrative remedies with regard to the April 2004 job opening, filled in September 2004, that forms the basis for her failure to promote claim.

Therefore, Legacy Bank's motion for summary judgment based upon failure to exhaust plaintiff's remaining Title VII failure to promote claims is GRANTED as to the May 2004 job opening but DENIED as to the April 2004 job opening. Nevertheless, for the reasons stated in Section C, infra, Legacy Bank's motion is granted as to the substantive aspect of plaintiff's failure to promote claims.

**B.  Section 1981's Statute of Limitations**

In Legacy Bank's previously discussed motion to dismiss, Legacy Bank also moved to dismiss all of plaintiff's claims under section 1981, alleging that they were barred by the statute of limitations. The court held that plaintiff's failure to promote claims arising outside of a four-year statute of limitations (the longest available period) were dismissed, but then ruled that it did not have enough information to determine whether the four-year or shorter two-year limitations period should apply, a determination which requires a qualitative analysis to determine whether a new and distinct employment relationship would have emerged from the promotion. (Doc. 49 at 10-13.)  Legacy Bank now moves for summary judgment on plaintiff's section 1981 claims, alleging they are barred by the two-year statute of limitations. (Doc. 123 at 14-16.)

In its prior order, the court set out the following standards of law regarding section 1981 limitations periods:

> Whether a two- or four-year limitation period applies to [the employee's] claim for failure to promote depends, therefore, upon whether such a claim would have been actionable under the pre-1991 version of § 1981.  Some failure to promote claims were actionable before the 1991 amendment, but only those that rose to the level of an opportunity for a new and distinct relation between the employee and the employer.  In other words, a failure-to-promote claim was actionable before the 1991 amendment if it equated to contract formation.  Thus, if a 'new and distinct relation' between [the employee] and [the employer] would have resulted from [the employee's] promotion . . ., then the state's residual two-year statute of limitations for personal injury actions would apply to limit [the employee's] claim.  If no such new relationship would have resulted, the 1991 amendment to § 1981 made [the employee's] claim viable as postformation conduct and the four-year

limitation period would apply.

. . .

> In Hooks[ v. Diamond Crystal Specialty Foods,
> Inc., 997 F.2d 793 (10th Cir. 1993)], this court
> noted that whether a new and distinct
> relationship emerges from promotion should not be
> measured in quantitative terms, like the amount
> of potential pay increase.  Rather, a court
> should look to whether there exists a meaningful,
> qualitative change in the contractual
> relationship.  We do not confine our inquiry to
> titles, but should examine actual changes in
> responsibility and status.  Such changes in the
> contractual relationship could include promotions
> from nonsupervisory positions to supervisory
> positions and advancements from being paid by the
> hour to being a salaried employee.

Cross v. The Home Depot, 390 F.3d 1283, 1288-89 (10th Cir.
2004) (internal citations and quotations omitted).

(Doc. 49 at 11-12.)

Legacy Bank contends the two-year statute of limitations applies, thus foreclosing plaintiff's failure to promote claims (plaintiff filed her complaint in this court on October 24, 2006 and both the April and May 2004 failure to promote allegations are outside a two-year limitations period).  Legacy Bank argues that plaintiff's position at the time she applied for the two promotions was an hourly paid, non-exempt from overtime, non-officer position, which did not require election by the board of directors.  In addition, Legacy Bank states that plaintiff's job-title was not managerial and involved no supervision of other employees.  In contrast, the April and May 2004 positions were salaried, overtime-exempt, officer positions, which required election by the board of directors.  The job titles required managerial responsibilities and supervision of others.

Plaintiff counters, however, by arguing that she sought to

-24-

"advance in her career path" rather than create a "new and distinct relationship" with Legacy Bank by applying for the April and May 2004 positions.  Plaintiff argues that there is a disputed fact whether she was actually exercising supervisory authority and was acting as a "second-in-command" at Legacy Bank prior to April-May 2004 (i.e., if plaintiff was already a supervisor, the change to a job title with supervisor responsibility would not have been new or distinct).  Plaintiff also contends the mortgage department manager job description (the April 2004 position) did not include supervision of employees and was simply an increase in the value and type of loans she would have been processing.

Regardless of whether plaintiff's CSR position included supervisory experience and whether the April and May 2004 positions included supervisory experience, it is undisputed that plaintiff would have moved from an hourly position to a salaried position, from a non-exempt position to an exempt position, and from an employee position to an officer and elected position.  Plaintiff does not create any genuine issue of material fact with regard to these qualitative factors.  In addition, even if plaintiff had been unofficially supervising her co-workers, the April 2004 job description requires training and managing and the May 2004 job description requires supervision of employees.  The April and May 2004 job descriptions included supervision and management as part of the job descriptions, which would have been a change from her previous job description.

It is clear from the undisputed record that both the April and May 2004 promotions would have created a new, distinct relationship. No other determination would be reasonable based on prior Tenth

-25-

Circuit cases.  See Cross, 390 F.3d at 1285-90 (finding that no new and distinct relationship would have arisen where the qualifications for and duties of positions were same and both positions were supervisory, salaried, exempt positions; despite evidence that amount of people and financials supervised would have increased and compensation would have increased); Hooks v. Diamond Crystal Specialty Foods, Inc., 997 F.2d 793, 802 (10th Cir. 1993) (stating that a promotion from a non-supervisory position to a supervisory position and the move from an hourly to a salaried employee "are indicative of a qualitative change in the contractual relationship" because they implicated "a heightened level of responsibility and increased level of accountability to the company").

Based on the above, the court finds that the April and May 2004 failure to promote claims are not viable under the section 1981 statute of limitations.  Legacy Bank's motion for summary judgment on these claims is GRANTED.[9]

---

[9] Regardless, even if the court found that the four-year statute of limitations applied to plaintiff's section 1981 claims, the court would grant Legacy Bank's motion for summary judgment on the merits.
    With regard to the April 2004 failure to promote claim, plaintiff's claim fails for the same reasons discussed in the next section, because the same standards of law apply to plaintiff's claims under Title VII and section 1981.  Perry v. Woodward, 199 F.3d 1126, 1135 (10th Cir. 1999) ("[T]he analytical framework [McDonnell Douglas] pioneered applies equally to claims brought pursuant to section 1981."); Thomas v. Denny's, Inc., 111 F.3d 1506, 1513 (10th Cir. 1997) (holding that when parallel claims are brought under Title VII and section 1981, based on the same facts, the elements of the cause of action are identical).
    With regard to the May 2004 failure to promote claim, plaintiff cannot meet her prima facie burden because she cannot show she was qualified for the position (plaintiff had no experience as a teller and had previously had disagreements with the same tellers she would have been supervising as branch manager).  In addition, plaintiff cannot show that Legacy Bank's legitimate, nondiscriminatory reason for its failure to promote plaintiff (that another, more-qualified

**C.  Remaining Failure to Promote Claims**

A plaintiff proves a prima facie case of discrimination based on failure to promote under Title VII by presenting evidence that: 1) she is a member of a protected class; 2) she applied for and was qualified for the particular position; 3) she was not promoted despite her qualifications; and 4) the position was filled or remained open after she was rejected.  Cross v. The Home Depot, 390 F.3d 1283, 1286 (10th Cir. 2004).  If plaintiff establishes her prima facie case, the burden shifts to Legacy Bank to articulate a legitimate nondiscriminatory reason for the adverse employment action.  If Legacy Bank does so, the burden shifts back to plaintiff to show that Legacy Bank's stated justification is pretextual.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  Therefore, only if plaintiff presents evidence for her prima facie case, and shows there is reason to believe the employer's reasons for the alleged discriminatory failure to promote are pretextual, should Legacy Bank's motion for summary judgment fail and the case be submitted to the jury.

There is no dispute that plaintiff's national origin is Lebanese and that she is a member of a protected class.  See 29 C.F.R. § 1606.1 (defining national origin discrimination broadly to include "denial of equal employment opportunity because of an individual's . . . place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group").  There is only one failure to promote claim remaining for consideration under

applicant was selected), is pretext for discrimination.  The only evidence in the record shows that the individual selected for the position, Hill, was more qualified.

Title VII: the mortgage department manager position in April 2004 that was ultimately filled by Kathy Seiler in September 2004.  Plaintiff was not promoted to this position and it was filled by another applicant, thus satisfying both the third and fourth element of her prima facie case.  See Cross, 390 F.3d at 1286 (defining third element as "[the plaintiff] was not promoted despite his qualifications" and fourth element as "the position was filled or remained open after [the plaintiff] was rejected").

It is also undisputed that plaintiff applied for the position.  Therefore, the only element of plaintiff's prima facie case that is in dispute is whether she was qualified for the position to which she applied.  See id. (defining second element as "[the plaintiff] applied for and was qualified for the particular position").  Legacy Bank disputes that plaintiff was qualified, alleging that plaintiff had no management experience and had never made a mortgage loan.  Plaintiff counters, only in her factual section, by arguing that she did have prior supervisory experience because her bank manger, Madsen, recognized that she had been treated as a de facto second in command at her branch.

Clearly, simply having de facto supervisory experience was not the only qualification for the job of mortgage department manager.  It is undisputed that plaintiff had no experience with mortgages.  But, regardless of plaintiff's prima facie case, Legacy Bank has articulated a legitimate, non-discriminatory reason for its failure to promote plaintiff.  "At this stage, [the defendant] is required only to explain its actions against the plaintiff in terms that are not facially prohibited by Title VII.  Indeed, [the defendant]

satisfies this step by asserting non-discriminatory reasons for hiring the successful applicants rather than [the plaintiff]." Jones v. Barnhart, 349 F.3d 1260, 1266 (10th Cir. 2003) (internal quotation omitted).

The undisputed facts show that the candidate who was chosen for the position was better qualified. Legacy Bank contends Seiler was "substantially more qualified" because she had over fifteen years of experience in a title company, had management and supervisory experience, and had extensive experience working with commercial and consumer mortgage loans. This is a legitimate, non-discriminatory reason for choosing Seiler for the position rather than plaintiff. See id. (finding that the reasons that the successful candidate was more likely to acclimate quickly, better able to interact with supervisors, and that the plaintiff was not a skilled writer, which was a position requirement, were legitimate, non-discriminatory reasons for failing to promote the plaintiff).

Plaintiff offers no argument regarding how Legacy Bank's choice of Seiler for the position rather than her was pretext for unlawful discrimination. No pretext is found by the court. For the reasons stated, Legacy Bank's motion for summary judgment on plaintiff's failure to promote claims must be GRANTED.

**D. Discriminatory Termination**

To establish a prima facie case of discrimination under Title VII based on a discharge, a plaintiff must show: 1) she was a member of a protected class; 2) she was qualified and satisfactorily performing her job; and 3) she was terminated under circumstances giving rise to an inference of discrimination. Salguero v. City of Clovis, 366 F.3d

1168, 1175 (10th Cir. 2004).  The <u>McDonnell Douglas</u> burden shifting framework also applies to claims of discriminatory discharge.  <u>Etsitty v. Utah Transit Authority</u>, 502 F.3d 1215, 1220 (10th Cir. 2007).

Assuming plaintiff establishes her prima facie case,[10] the burden then shifts to Legacy Bank to articulate a legitimate, nondiscriminatory reason for plaintiff's termination.  "At this stage of the <u>McDonnell Douglas</u> framework, [the defendant] does not need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.  Rather, [the defendant] need only explain its actions against the plaintiff in terms that are not facially prohibited by Title VII."  <u>Etsitty</u>, 502 F.3d at 1224 (internal quotations omitted).

Legacy Bank asserts that plaintiff's employment was terminated at the end of her three-month probationary period because plaintiff was not meeting expectations: Yaeger and Bugner felt plaintiff was argumentative, rude and insubordinate during a meeting, Yaeger counseled plaintiff regarding keeping her door shut, plaintiff and Bugner had a dispute over plaintiff's job duties and the chain of command for questions, and Yaeger felt plaintiff did not have a good understanding of real estate loans.  Additionally, plaintiff's employment was terminated, rather than giving plaintiff job coaching, because Suellentrop, Yaeger, and Bugner believed she would be argumentative in response to coaching.  (Doc. 123 at 26-29.)  Legacy

---

[10]  This is a generous assumption, as plaintiff has not presented evidence that she was "satisfactorily performing her job" or that her employment was "terminated under circumstances giving rise to an inference of discrimination."

Bank's stated justification for termination of plaintiff's employment is legitimate and nondiscriminatory. <u>Montes v. Vail Clinic, Inc.</u>, 497 F.3d 1160, 1176 (10th Cir. 2007) (holding that insubordination is a legitimate, non-discriminatory reason for termination); <u>Metzler v. Federal Home Loan Bank of Topeka</u>, 464 F.3d 1164, 1172 (10th Cir. 2006) (holding that "poor job performance, poor attitude, and failure to maintain adequate job-related skills" are a legitimate, non-retaliatory reason for terminating employment).

To survive summary judgment, plaintiff must show that there is a genuine issue of material fact as to whether Legacy Bank's explanation for terminating her employment is pretextual.

> A plaintiff shows pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons. One typical method for a plaintiff to prove pretext is by providing direct evidence that the defendant's stated reason for the adverse employment action was false. Another common method is a differential treatment argument, in which the plaintiff demonstrates that the employer treated the plaintiff differently from other similarly-situated employees who violated work rules of comparable seriousness in order to show that the employer failed to follow typical company practice in its treatment of the plaintiff. Evidence of pretext may also take a variety of other forms. A plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual.
>
> . . .
>
> [W]hen a plaintiff's evidence supports a nondiscriminatory motive for the employer's action and the plaintiff presents no evidence to undermine that motive, summary judgment for the

-31-

employer is appropriate. . . . We have also
upheld summary judgment for the employer based on
the employer's own alternative, nondiscriminatory
explanations, so long as they remain unrebutted
and the employer's credibility has not been so
damaged as to render such explanations suspect.

Swackhammer v. Sprint/Unite Mgmt. Co., 493 F.3d 1160, 1167 (10th Cir.

2007) (internal quotations omitted).

Plaintiff alleges that Legacy Bank's stated reason for

termination of her employment is "merely a pretext concealing illegal

discriminatory animus." (Doc. 134 at 16.) The alleged evidence of

pretext is:

1.   in January 2004, Legacy Bank changed scheduling policies
     that adversely affected plaintiff's ability to earn
     overtime;

2.   in April 2004 Legacy Bank monitored plaintiff's e-mail;

3.   plaintiff was not promoted to the April and May 2004
     promotions;

4.   after plaintiff was promoted, the job description for the
     position she accepted had changed;

5.   after starting the new position, in September 2004,
     plaintiff saw that her supervisor had scheduled a "write-
     up" for plaintiff;

6.   plaintiff's supervisors, Yaeger and Bugner, thought
     plaintiff was rude and insubordinate during a meeting, but
     did not discipline plaintiff for that alleged behavior;

7.   the testified-to complaints to Yaeger regarding plaintiff's
     alleged behavior are not true;

8.   plaintiff's direct supervisor, Bugner, "had little to no
     mortgage loan experience herself and was not even in the
     same location as plaintiff";

9.   neither Bugner nor Yaeger, who both recommended to
     Suellentrop that plaintiff's employment be terminated,
     counseled plaintiff regarding work performance deficiency;

10.  Sam Lines, a loan officer at Legacy Bank, instructed
     Bugner, plaintiff's supervisor, to "clean-up" plaintiff's
     ninety-day evaluation, that plaintiff had done well on the

-32-

        secondary market side, asked good questions, and had a good
grasp of what needed to be done; and

11.    Legacy Bank did not consider transferring plaintiff to
another position rather than terminating her, nor did Legacy
Bank consider extending plaintiff's probationary period,
despite having these options in Legacy Bank's policies.

(Doc. 134 at 16-18.)

      Plaintiff fails to raise a genuine issue of material fact as to
whether the asserted reason for termination of her employment is
pretextual.  Despite her many allegations of pretext, she has alleged
nothing that reveals "such weaknesses, implausibilities,
incoherencies, or contradictions in the employer's proffered
legitimate reasons for its actions that a reasonable fact finder could
rationally find them unworthy of credence." <u>Argo v. Blue Cross & Blue
Shield</u>, 452 F.3d 1193, 1203 (10th Cir. 2006).

      Plaintiff's first allegation fails because the scheduling change
affected all non-officer employees; it was not aimed at plaintiff.
Plaintiff's first, second, and third allegations are too remote in
time to show any relation to the termination of her employment on
January 18, 2005.  Plaintiff's ninth allegation is not supported by
the record.  Plaintiff's fourth through eighth, tenth, and eleventh
allegations do not in any way show how Legacy Bank's stated
justification for termination is pretextual.  The fourth allegation
does not create doubt that Legacy Bank <u>terminated</u> plaintiff's
employment for non-discriminatory reasons.  The fifth allegation,
although admittedly true, is incomplete because it does not address,
much less refute, Bugner's stated reason for making the reminder to
do a "write up" for the file.  The sixth allegation is also

-33-

incomplete--Yaeger and Bugner did make a contemporaneous note for plaintiff's file regarding plaintiff's behavior. The seventh allegation, whether complaints about plaintiff are true or not, is irrelevant because it does not rebut that Yaeger thought them to be true. The eighth allegation, apparently attempting to rebut the fact that one of the stated reasons for termination was that plaintiff did not follow the chain of command in asking questions, is merely plaintiff's justification for <u>why</u> she did not do so, not that Legacy Bank's statement is incorrect. The tenth allegation does not address how Yaeger and Bugner, plaintiff's two supervisors, viewed plaintiff's job performance, just what Lines' believed. Finally, the eleventh allegation as also incomplete. Legacy Bank's personnel testified that plaintiff was not considered for additional job coaching because it felt that plaintiff would have been argumentative and the record clearly shows that a replacement was already in plaintiff's former job.[11]

Plaintiff's allegations are not evidence that Legacy Bank's stated reason for firing her was false, contrary to a written policy "prescribing the action to be taken" by Legacy Bank, or that Legacy Bank acted contrary to an unwritten policy or contrary to company practice when terminating plaintiff's employment. In addition, plaintiff has not presented any evidence that Legacy Bank's proffered non-retaliatory reasons were a post-hoc fabrication or otherwise did not actually motivate the employment action. <u>Kendrick v. Penske</u>

---

[11]   In addition, Legacy Bank presents evidence that another officer was treated in the same manner as plaintiff by being terminated at the end of that officer's ninety day probation period.

Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).

For the reasons stated herein, Legacy Bank's motion for summary judgment on plaintiff's discriminatory termination claim is GRANTED.

**E. Retaliation**

The McDonnell Douglas burden shifting framework also applies to claims of retaliation. Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1180-81 (10th Cir. 2006). To establish a prima facie case of retaliation, plaintiff must show: 1) she engaged in protected opposition to discrimination; 2) a reasonable employee would have found the challenged action materially adverse; and 3) there exists a causal connection between plaintiff's protected activity and the materially adverse action. Somoza v. Univ. of Denver, 513 F.3d 1206, 1212 (10th Cir. 2008).

Plaintiff's first administrative agency complaint, filed on January 21, 2004, alleged that she was retaliated against for "lodging complaints of harassment and discrimination." In her second administrative agency complaint, filed on June 6, 2005, plaintiff again alleged that she had been retaliated against. Plaintiff's response to Legacy Bank's motion discusses only a retaliatory discharge claim, and then points to other alleged evidence of retaliation to lend support to her prima facie case. (See Doc. 134 at 20-23.) The court will similarly proceed.

There is no dispute that plaintiff's filing of her first administrative agency complaint is "protected opposition to discrimination." And there is also no dispute that termination of plaintiff's employment would be materially adverse to a reasonable employee. Mickelson v. New York Life Ins. Co., 460 F.3d 1304, 1316

-35-

(10th Cir. 2006).  Legacy Bank disputes the third prong of plaintiff's prima facie case: that there exists a causal connection between plaintiff's administrative agency complaint and termination of her employment.

The causation element, _i.e._, the required link between the protected activity and subsequent adverse employment action, can be inferred if the action occurs within a short period of time after the protected activity.  See McGowan v. City of Eufala, 472 F.3d 736, 744 (10th Cir. 2006) ("[T]he required link between the protected activity and subsequent adverse employment action can be inferred if the action occurs within a short period of time after the protected activity.") However, "[u]nless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."  Id.; Piercy v. Maketa, 480 F.3d 1192, 1198 (10th Cir. 2007) ("A retaliatory motive may be inferred when an adverse action closely follows protected activity.  However, unless the termination is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999))).

Plaintiff filed her administrative agency complaint on January 21, 2004 and her employment was terminated on January 18, 2005. Almost one full year passed between the filing of her complaint and her firing.  This time period is insufficient to support an inference of a causal connection.  See Anderson, 181 F.3d at 1179 ("[W]e have held that a one and one-half month period between protected activity

and adverse action may, by itself, establish causation. By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation.").

Thus, plaintiff must offer additional support of a causal connection between the administrative agency complaint and her termination. <u>See</u> <u>Piercy v. Maketa</u>, 480 F.3d at 1198 (stating that "the passage of time does not necessarily bar a plaintiff's retaliation claim if <u>additional</u> evidence establishes the retaliatory motive"); <u>Antonio</u>, 458 F.3d at 1181 ("An employee may establish the causal connection by proffering evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. But unless there is a very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." (internal quotations and citations omitted)); <u>Proctor v. United States</u>, 502 F. 3d 1200, 1208-09 (10th Cir. 2007) (holding that "a four month time period does not support an inference of retaliatory motive" and requiring the plaintiff to "present additional evidence to establish the necessary causal connection").

Plaintiff's additional proffered evidence of causation is as follows:

1.  the late January 2004 change in bank policies which resulted in plaintiff needing approval to perform services she previously had authority to do;

2.  the February 11, 2004 (twenty days after plaintiff filed her first administrative agency charge) change in scheduling of hours that resulted in a reduction of plaintiff's overtime;

3.  the removal of plaintiff's job task of keeping an absentee log in late 2003;

> 4.   plaintiff applied for but was denied the April 2004 and May 2004 promotions; and
>
> 5.   after plaintiff accepted her promotion in August 2004, the new position did not go into effect until after her replacement was hired and trained, and her job description was different at the time she began the new position.

(Doc. 134 at 20-22.)

Based on the above, the court reluctantly concludes that plaintiff has pointed to enough evidence to create a genuine issue of material fact with respect to the prima facie element of causation. See McGowan Allstar Maintenance Inc., 273 F.3d 917, 922 (10th Cir. 2001) (characterizing a plaintiff's prima facie burden as "not onerous"). Although the first and second allegations were implemented bank-wide, they occurred close in time after plaintiff's first administrative agency charge, and affected plaintiff more noticeably than other employees. The fourth allegation also occurred soon after plaintiff's first administrative agency complaint and could give rise to an inference of discrimination because of its temporal proximity. The third and fifth allegations are irrelevant, however. The third allegation occurred more than a year prior to plaintiff's termination and is not related in any way to that termination. The fifth allegation is nothing more than reasonable action by Legacy Bank after promoting an existing employee to a new position. Considering the entire record, plaintiff has pointed to some evidence occurring after she filed her first administrative agency complaint which creates a genuine issue of material fact whether the circumstances surrounding her termination give rise to an inference of retaliatory discrimination. Kendrick v. Penske Transp. Svcs., Inc., 220 F.3d 1220, 1227 (10th Cir. 2000) ("The critical prima facie inquiry in all

cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination.").

However, as discussed above, Legacy Bank has met its burden at the next step of the McDonnell Douglas burden shifting framework by offering a legitimate, nondiscriminatory justification for its actions. Legacy Bank terminated plaintiff's employment because it believed her job performance was poor, and that she was argumentative and insubordinate. See supra at 30-31 (discussing Legacy Bank's offering of a legitimate, non-discriminatory justification for termination of plaintiff's employment in relation to plaintiff's discriminatory termination claim).

Plaintiff, moving on to the final step in the McDonnell Douglas burden shifting framework, alleges the following is evidence of pretext:

1. one of the stated reasons for termination of plaintiff's employment was that she was rude and insubordinate, but the meeting in which Yaeger and Bugner thought plaintiff was rude and insubordinate occurred nearly four months before her firing;

2. another of the stated reasons for termination of plaintiff's employment was that plaintiff was not bringing her questions to Bugner, but plaintiff contends she was actually instructed to bring questions regarding mortgage loans to Lyons and Seiler and only questions regarding consumer loans to Bugner;

3. plaintiff was never counseled regarding her job performance during her probation period; and

4. plaintiff's supervisors acted contrary to Legacy Bank's policies in terminating plaintiff's employment.

(Doc. 134 at 23-26.)

Plaintiff's alleged evidence of pretext does not create a genuine

issue of material fact whether Legacy Bank's justification for termination of plaintiff's employment was pretext for unlawful discrimination.  The first allegation is not evidence of pretext because while the meeting was relatively remote in time, it was within plaintiff's probationary period at her new position.  Regarding the second allegation, while there is a genuine issue over to whom plaintiff was instructed to bring questions, it is uncontroverted that plaintiff was counseled about this behavior by Bugner, and thus clearly would have known from that point forward.  The third allegation is not supported by the record, which shows that plaintiff was counseled by Yaeger and Bugner during her probationary period.  Finally, the fourth allegation is false.  Legacy Bank's policies permitted, but did not require, any different behavior by the bank than was carried out.  Plaintiff has not carried her burden of showing that a reasonable fact finder could rationally find Legacy Bank's stated justification unworthy of belief.  Argo v. Blue Cross & Blue Shield, 452 F.3d 1193, 1203 (10th Cir. 2006).

For the reasons stated herein, Legacy Bank's motion for summary judgment on plaintiff's retaliation claim is GRANTED.

## IV.  CONCLUSION

Defendant's motion for summary judgment (Doc. 121) is GRANTED in its entirety.  The clerk is directed to enter judgment for defendant, pursuant to Rule 58.

A motion for reconsideration of this order is not encouraged.  Any such motion shall not exceed 3 double-spaced pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp, 810 F. Supp. 1172, 1174 (1992).  The response to any motion

for reconsideration shall not exceed 3 double-spaced pages.  No reply
shall be filed.

     IT IS SO ORDERED.

     Dated this __18th__ day of June, 2008, at Wichita, Kansas.

                              s/Monti Belot_____
                              Monti L. Belot
                              UNITED STATES DISTRICT JUDGE